## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | |
|---|---|
| JEFFREY HIGGINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 1:11-cv-00148-NT |
| | ) |
| KEVIN REED and JOSEPH BUBAR, | ) |
| in his official capacity as Chief of | ) |
| Police of the City of Fort Fairfield, | ) |
| Maine, | ) |
| | ) |
| Defendants. | ) |

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### BACKGROUND

On May 26, 2007, Officer Kevin Reed of the Fort Fairfield Police Department
(**"FFPD"**) responded to a complaint that Jeffrey Higgins had exposed himself to
children outside his mother's apartment building in Fort Fairfield, Maine. An
altercation between Officer Reed and Mr. Higgins ensued, and Officer Reed drew
his Taser[1] and shot Mr. Higgins three times. Mr. Higgins was then arrested on
charges of disorderly conduct and refusing to submit to arrest. Mr. Higgins brought
a six-count Complaint against Officer Reed in his individual capacity and Chief
Joseph Bubar in his official capacity as Chief of the FFPD,[2] alleging violations of 42
U.S.C. § 1983, the Maine Civil Rights Act (**MCRA**), Title II of the Americans with

---

[1]    A Taser is a weapon that fires two probes connected to high-voltage insulated wires that
attach to a subject's body or clothes and transmit a .26 watt electrical signal that physically

[2]    Because Chief Bubar is sued only in his official capacity, he is not entitled to qualified
immunity. *Kentucky v. Graham,* 473 U.S. 159, 167, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).

Disabilities Act (**ADA**), and the Maine Human Rights Act (**MHRA**). Officer Reed filed for partial summary judgment on counts III, IV, and V, and Chief Bubar filed for summary judgment on all counts. For the reasons that follow, the Court hereby **GRANTS** Officer Reed's Partial Motion for Summary Judgment on Counts III, IV, and V, and **GRANTS** Chief Bubar's Motion for Summary Judgment.

## FACTS

The parties have presented widely disparate versions of the facts. The Court is required on motion for summary judgment to make all reasonable inferences in the nonmovant's favor. The facts viewed in the light most favorable to the Plaintiff[3] are as follows.  Mr. Higgins is a gay man who has been diagnosed with depression, paranoia, and delusional disorder. Mr. Higgins has never been hospitalized because of his mental illness, and his symptoms of depression and paranoia are controlled by medication.

On May 26, 2007, FFPD Officer Kevin Reed[4] responded to a complaint from a neighbor that Mr. Higgins had exposed himself to the complainant's young

---

[3]     The Plaintiff complicated matters by both admitting the Defendants' version of the facts and setting forth additional facts diametrically opposed to those he admitted. *See* Plaintiff's Response to Statement of Facts (Doc. 20). In accordance with the Court's request at a conference of counsel held June 21, 2012, the Plaintiff submitted a new Response that for the most part denied the Defendants' statements of fact that were inconsistent with the Plaintiff's version of the arrest. *See* Plaintiff's Response to Statement of Facts to Clarify the Record (Doc. 28).

[4]     Officer Reed has worked for the FFPD as a patrolman since May of 2004. Before becoming a police officer, Officer Reed served for about twelve years in the military where he was trained on use of force, investigation, sexual discrimination, and interview and interrogation techniques. In April of 2004, before joining the FFPD, Officer Reed completed a 100-hour reserve/part-time officer training course through the Maine Criminal Justice Academy. After being hired by the FFPD, Officer Reed participated in field training, and on December 16, 2005, he received a certificate for completing the Basic Law Enforcement Training Program. Officer Reed was provided with the Standard Operating Procedures of the FFPD. He also developed the FFPD's Taser policy and was trained in Taser use.

daughters.[5] Officer Reed spoke to the complainant, and then went to the apartment where Mr. Higgins was living with his mother, Maxine Higgins. Mrs. Higgins told Officer Reed that her son had gone to bed, that she was concerned that he was mixing liquor with prescription drugs, and that he had returned very drunk from a friend's house that day.[6] Officer Reed told Mrs. Higgins about the neighbor's complaints and suggested that Mrs. Higgins seek mental health treatment for Mr. Higgins from Aroostook Mental Health Center. Officer Reed left without asking Mrs. Higgins to wake Mr. Higgins, hoping that Mr. Higgins would sleep off the intoxication and realize that he had been inappropriate. Officer Reed returned to the neighbor and told him to call the police if Mr. Higgins exposed himself again.

According to Mr. Higgins's version of the arrest,[7] Mr. Higgins woke up shortly after Officer Reed left Mrs. Higgins and saw Officer Reed speaking to the neighbor. As Mr. Higgins was standing in the doorway, Officer Reed, who was a few

---

[5]     The Plaintiff challenges the admissibility of the neighbor's complaints to Officer Reed, arguing that they are inadmissible hearsay under Federal Rule of Evidence 802. The Court uses these statements not for the truth of the matters asserted but rather for the permissible purpose of explaining what Officer Reed did next. *United States v. Bailey*, 270 F.3d 83 (1st Cir. 2001) ("Out of court statements offered not for their truth but 'offered only for context' do not constitute hearsay.").

[6]     The Plaintiff challenges Mrs. Higgins's statements as hearsay. The Court uses these statements not for the truth of the matter asserted but rather for the permissible purpose of showing Officer Reed's state of mind. *United States v. Murphy*, 193 F.3d 1, 5 n.2 (1st Cir. 1999) ("[A]n out-of-court statement might be offered to show that the declarant had certain information, or entertained a specific belief . . . or it might be offered to show the effect of the words spoken on the listener (e.g. to supply a motive for the listener's action).").

[7]     The Defendants' account of the arrest is very different from the Plaintiff's. Officer Reed testified in his deposition that after leaving the complainant's apartment, he saw and heard Mr. Higgins standing in his driveway yelling and swearing in front of neighborhood children. According to the Plaintiff's deposition and his clarification of the facts, Mr. Higgins did not go outside onto the driveway; he did not yell or swear; and Officer Reed charged at and barged into Mr. Higgins's home. October 6, 2011 Higgins Deposition at 63:2-12 (Doc. 20-7).

hundred feet away, caught sight of Mr. Higgins and ran towards his apartment.[8] As Officer Reed approached the apartment, Mr. Higgins, who stood in the doorway, told Officer Reed that he would be complaining to the Attorney General's Office, the Hate Crime Unit, and his attorneys about FFPD Officer James Chartier's visit the previous night on another indecent exposure complaint. Officer Reed barged into the apartment, stating that he had a complaint relating to Mr. Higgins's "shorts dragging and urinating." In a normal voice, Mr. Higgins denied that his shorts were dragging or that he had urinated outside. This exchange lasted about fifteen to twenty seconds. Officer Reed was able to smell alcohol on Mr. Higgins during the exchange.

After pushing his way into the apartment, Officer Reed raised his handcuffs, snapped them at Mr. Higgins, and told Mr. Higgins that he was being arrested for disorderly conduct. Mr. Higgins took several steps back into the kitchen and denied that he was being disorderly. Officer Reed dropped his handcuffs.  As he picked them up, he stepped on Mr. Higgins's toe, causing Mr. Higgins to fall to the floor. Once Mr. Higgins was down on the floor, Officer Reed drew his Taser and shot Mr. Higgins three times.[9]

---

[8]     In the Complaint and his Response to Defendants' Motions for Summary Judgment, the Plaintiff claims that Officer Reed said something about a "faggot" on his charge to Higgins's apartment. The Plaintiff provides no record support for this claim.

[9]     The Plaintiff's own Statement of Additional Material Facts (Doc. 20) (**PSAMF**) contradicts itself on whether Mr. Higgins fell to the floor after the first shot, *id.* at ¶ 208, or was on the floor for all three Taser firings. *Id.* at ¶¶ 185-87. Mr. Higgins testified in his October 6, 2011 deposition that he fell down when Officer Reed stepped on his toe and was Tased once he was on the ground. October 6, 2011 Higgins Deposition at 67:22-25, 68:1-4.

According to Mr. Higgins's account, he was not outside immediately before the arrest; he was not screaming or swearing; he was not threatening to make Officer Reed pay for years of discrimination; and he was not defying Officer Reed or resisting arrest. Officer Reed told Mr. Higgins that he was being arrested for disorderly conduct only once; he did not order Mr. Higgins to submit to arrest; and he did not warn Mr. Higgins that he would fire the Taser. At no point before or after he started using the Taser did Officer Reed tell Mr. Higgins to get on his stomach or give him any instructions on submitting to arrest. Mr. Higgins lay on the floor groaning in pain and never tried to stand up or do anything after the first shot. Mr. Higgins denied that he had been mixing alcohol with his prescription drugs as his mother had claimed, and he said that his mother probably thought his sodas were alcoholic beverages.

When Mr. Higgins was taken to the Aroostook Medical Center to have the Taser probes removed after his arrest, he refused to take a breathalyzer test.

Mr. Higgins was charged with disorderly conduct, 17-A M.R.S.A. § 510-A, and refusing to submit to arrest, 17-A M.R.S.A. § 751-B. After the arrest Officer Reed issued Mr. Higgins a summons for indecent exposure, 17-A M.R.S.A. § 854. All of the charges brought against Mr. Higgins were ultimately dismissed.[10]

Chief Bubar reviewed Officer Reed's arrest report and was satisfied that probable cause existed for the crimes charged and that Officer Reed had not

---

[10]     Although the record is silent as to why the disorderly conduct and resisting arrest charges were dropped there is a suggestion that the indecent exposure charge was dropped because the evidence that Mr. Higgins exposed his genitals was insufficient. Reed Deposition at 79 (Doc. 14-8).

violated the Fort Fairfield Standard Operating Procedures by not calling for backup.[11] Chief Bubar also believed that Officer Reed was justified in cycling his Taser three times to gain Mr. Higgins's compliance.[12] The record does not contain the incident reports that were reviewed by the Chief, so it is unclear to the Court exactly what Chief Bubar was approving.

Prior to this incident, Officer Reed did not consider Mr. Higgins to be mentally ill. Officer Reed did not believe that Mr. Higgins was in a mental health crisis during the incident, although he did suggest to Mrs. Higgins before the incident that Mr. Higgins get mental health help, and he did describe Mr. Higgins's behavior as "bizarre." As part of the Basic Law Enforcement Training Program,

---

[11]     The FFPD's Standard Operating Procedures recognized that the following situations may require two law enforcement officers to respond:

      a.   Potential or actual assault on law enforcement officer
      b.   Possibility of or actual on-scene arrest for a felony or violent misdemeanor.
      c.   Potential or actual resistance to arrest.
      d.   Possibility of or actual use of force.
      e.   Crime in progress.
      f.   Fleeing suspect.
      g.   Domestic violence calls.

PSAMF Attachment 2 at 2 (Doc. 20-2). Law enforcement officers are directed to request back-up assistance in these situations.

[12]     The FFPD Taser policy "is for the X-26 Advanced Taser to be used to lower the risk of suspect and Officer injury when the use of force is lawfully justified." Defendants' Joint Statement of Material Facts (**DJSMF**) at ¶ 58 (Doc. 14). The Taser "may be used to control a dangerous or violent subject when deadly physical force does not appear to be justified and/or necessary; or attempts to subdue the subject by other conventional tactics have been, or will be unsafe for Officers to approach within contact range of the subject." DJSMF Additional Attachment 3 at 1 (Doc. 15-3).

     The policy enumerates a number of circumstances when the Taser may be used, including when "[t]he suspect is punching or kicking," "[t]he suspect is threatening to punch or kick," "[l]esser force options are ineffective," "[t]he Officer reasonably believes the suspect poses a credible threat," or "[t]he suspect poses a threat from a distance, and the Officer is at risk of injury if he/she attempts to close in." DJSMF at ¶ 59. The policy specifically prohibits using the Taser in a punitive or coercive manner. *Id.* at ¶ 60.

Officer Reed was trained on the Americans with Disabilities Act, specifically that police officers must accommodate individuals with mental health issues.[13]

In May of 2007, the FFPD had a General Order in place, entitled "Response to Behavior of Persons in Mental Health Crisis," (the "**Crisis Policy**"), setting forth the agency's policy on contact with individuals having a mental health crisis.

The Crisis Policy also establishes a Crisis Intervention Team (**CIT**) to provide the Department with officers trained in handling an individual in mental health crisis. The Crisis Policy also states that "law enforcement officers will attempt to consult a CIT law enforcement officer prior to the use of physical control techniques

---

[13]    Officer Reed testified in his deposition that he took the training on ADA awareness, believed he had seen the training material, and was "sure" that it was included in his training manuals from the Academy. Officer Reed Deposition at 43:10-18. The ADA training materials stated:

> There are a number of physical disabilities and medical conditions that mimic criminal behavior. To comply with the Americans with Disabilities Act which forbids discrimination against people with disabilities, law enforcement officers must recognize that such disabilities and medical conditions exist. The basic ADA awareness class will provide officers with an overview of disabilities that may mimic criminal behavior.

DJSMF Additional Attachment 1 at 1 (Doc. 15-1). Officer Reed also received a Maine Criminal Justice Academy "All Points Bulletin" dated Fall 1994 that explained the holding and ramifications of this Court's decision in *Jackson v. Inhabitants of the Town of Sanford*, Civ. No. 94-12-P-H, 1994 WL 589617 (D. Me. Sept. 23, 1994). DJSMF ¶ 39. The Bulletin explained that: "Law enforcement employees are not required to be doctors. However, they are required to be alert to the possibility of encountering people with disabilities and the different types of disabilities." *Id.*

Also included in Officer Reed's training materials was a paragraph entitled "Criminal Behavior or Signs of Illness?", which instructed:

> Law enforcement officers are not expected to be doctors and perform diagnoses on the streets. When confronted with a situation, the officer must deal with it as it appears. If someone with swinging fists rushes an officer, the officer must control the attacker first and ask questions later. However, when there is no immediate danger, all officers should take the time to assess what is going on. Observe. Ask questions. Do not jump to conclusions. Evaluate. The decision you then make will be the best one possible.

DJSMF Additional Attachment 1 at 6.

on a person in mental health crisis." DJSMF Additional Attachment 2 at 5 (Doc. 15-2). However, in May of 2007, the FFPD had neither a CIT nor a CIT Officer.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, the Court shall grant summary judgment if the movant shows "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." "In applying this principle, it is important to bear in mind that not every genuine factual conflict necessitates a trial. It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir. 1995).

If the moving party will not bear the burden of proof at trial, the moving party can make a *prima facie* case that it is entitled to summary judgment by either submitting evidence that negates an essential element of the nonmoving party's claim, or demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986) (White, J., concurring). The nonmoving party may defeat the movant's *prima facie* entitlement to summary judgment by demonstrating to the Court specific facts in the record overlooked or ignored by the moving party that support the essential elements of the party's claim. *Id.* at 2557; *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

"'Even in [disability] discrimination cases where elusive concepts such as motive or intent are at issue,' summary judgment is appropriate if the non-moving party rests 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Forestier Fradera v. Municipality of Mayaguez*, 440 F.3d 17, 21 (1st Cir. 2006) (quoting *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir. 2003) (quoting *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir. 2000))).

## DISCUSSION

## I.  Municipal Liability – Defendant Bubar's Motion for Summary Judgment on Counts I, II and VI

### A. Background

Count I of the Complaint alleges that Officer Reed violated the Plaintiff's First and Fourth Amendment rights in violation of 42 U.S.C. § 1983.[14] Count II alleges that Officer Reed violated the Plaintiff's rights under the Maine Constitution in violation of the MCRA, 5 M.R.S.A. § 4682.[15] In Count VI, the Plaintiff alleges that the FFPD should be held liable for Officer Reed's violations of

---

[14]    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

[15]    "Whenever any person, whether or not acting under color of law, intentionally interferes or attempts to intentionally interfere by physical force or violence against a person, damage or destruction of property or trespass on property or by the threat of physical force or violence against a person, damage or destruction of property or trespass on property with the exercise or enjoyment by any other person of rights secured by the United States Constitution or the laws of the United States or of rights secured by the Constitution of Maine or laws of the State or violates section 4684-B, the person whose exercise or enjoyment of these rights has been interfered with, or attempted to be interfered with, may institute and prosecute in that person's own name and on that persons' own behalf a civil action for legal or equitable relief." 5 M.R.S.A. § 4682(1-A).

42 U.S.C. § 1983 and 5 M.R.S.A. § 4682 because the FFPD did not properly train Officer Reed and was deliberately indifferent to the risk of constitutional violations.

Chief Bubar has moved for summary judgment on Counts I, II and VI, arguing that the Plaintiff has failed to demonstrate any deficient FFPD policies or customs that were the moving force behind the alleged constitutional violations.

### B. Applicable Law

In order to hold a municipality liable for the constitutional violations of its employee, the plaintiff must meet two elements. First, a municipal employee must have violated the plaintiff's constitutional rights, and second, the municipality must be responsible for that violation. *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 26 (1st Cir. 2005). To establish that a municipality is responsible for a violation, the Plaintiff must show that the alleged municipal action constitutes a "policy or custom" attributable to the city. The second element has its own two components:

> 1) that the municipal policy or custom actually have caused the plaintiff's injury, and 2) that the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as deliberate indifference.

*Id.* (internal citations omitted). *See Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (municipality can be liable for the constitutional violations of an employee, not on a *respondeat superior* theory, but because official policy or custom caused the constitutional deprivation); *Bordanaro v. McLeod*, 871 F.2d 1151, 1155 (1st Cir. 1989).

10

In the absence of an unconstitutional "policy, statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," a municipality may be held liable for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690. The Eighth Circuit has succinctly summed up the requirements for establishing a municipal custom. The Plaintiff must show:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e. that the custom was the moving force behind the constitutional violation.

*Jane Doe A v. Special Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642, 646 (8th Cir. 1990). *See also Bordanaro*, 871 F.2d at 1156; *Buchanan v. Maine,* 417 F. Supp. 2d 45, 65 (D. Me. 2006).

A municipality can also be liable for a municipal employee's constitutional violation when the municipality had a "policy" of inadequately training its employees to avoid constitutional violations in usual and recurring situations. Again, the plaintiff must establish fault and causation: "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact" and "the identified deficiency in a city's training program must

be closely related to the ultimate injury." *City of Canton v. Harris*, 489 U.S. 378, 388, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

"'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). The Supreme Court has explained:

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick v. Thompson*, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011). Fault is established "[w]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Id.*

There are a number of cases that have helpfully defined the contours of deliberate indifference. *Bordanaro*, *Canton* and *Young* teach that in the absence of a pattern of constitutional violations, there has to be an egregious single incident or a single incident and some additional evidence suggesting deliberate indifference. In *Bordanaro*, the First Circuit affirmed a verdict against a municipality based on indirect evidence of the Chief of Police's constructive knowledge of a longstanding, widespread, facially unconstitutional custom at the Everett Police Department of breaking down doors without a warrant. The evidence at trial showed that the police broke down doors without a warrant often and that officers were provided

with a sledge hammer for that purpose. The evidence also showed that the Chief of Police used an "extensive report review process to monitor the conduct of his officers." *Bordanaro*, 871 F.2d at 1156-57. The *Bordanaro* court noted that "a 'single incident' of misconduct, without other evidence, cannot provide the basis for municipal liability under § 1983. Such a result would be the equivalent of imposing *respondeat superior* liability upon the municipality." *Id.* at 1161 n.8.

In *Canton*, the Supreme Court left open the possibility that a plaintiff could prevail on a failure to train claim based on a single incident. The Court posited that in a narrow range of circumstances where a constitutional violation was a highly predictable consequence of the failure to train officers to handle recurring situations, a single incident might suffice. *Brown,* 520 U.S. at 409 (discussing *Canton*, 489 U.S. at 390 n.10).

The First Circuit found such a case in *Young*, which involved the friendly fire killing of an off-duty police officer who was mistaken for a criminal when he responded to a crime scene. Although the plaintiff pointed to no evidence of any prior friendly fire shootings, there was testimony that the police department had an "always armed/always on duty" policy and was aware of the high risk that without training on avoiding off-duty misidentifications, friendly fire shootings were likely to occur. In *Young*, the evidence was sufficient for a jury to have found deliberate indifference even absent a widespread pattern.

There are a number of cases involving disastrous encounters between police officers and mentally ill individuals which shed light on deliberate indifference in

13

facts closer to those presented by the instant case. In a case closer to home, Judge Woodcock found that the plaintiff had failed "under either the *Bordanaro* recurring or *Young* single incident standards." *Buchanan*, 417 F. Supp. 2d at 68. *See Bordanaro*, 871 F.2d at 1161 n.8; *Young*, 404 F.3d at 28.  In *Buchanan*, two police officers went to check on Michael Buchanan, an individual with known mental illness who was demonstrating bizarre, paranoid behavior. One of the officers decided that he should take Buchanan into protective custody. When the officer attempted to reach for Buchanan, he resisted and retreated into his home. The officer followed Buchanan into the home and encountered him holding a knife. Buchanan stabbed the officer and the second officer drew his gun and fatally shot Buchanan. Buchanan's estate sued Lincoln County alleging that it was liable under section 1983 because, among other things, it failed to provide adequate training to its deputy sheriffs for encounters with mentally ill individuals. With no evidence that Lincoln County faced situations like Mr. Buchanan's on a regular and recurring basis, no evidence of what Lincoln County's policies and procedures were, and no evidence that the police were following or ignoring their standards, the district court concluded that the single incident shown by the plaintiffs was inadequate to establish that the County acted with deliberate indifference and granted summary judgment for the defendants.

In another deadly force case, *Valle v. City of Houston*, 613 F.3d 536 (5th Cir. 2010), the Fifth Circuit held that the Houston Police Department did not have municipal liability for its failure to provide adequate CIT training to all of its

officers. Plaintiffs argued that the city's failure to train officers in crisis intervention team tactics caused the police to break down the door and shoot a suicidal mentally ill individual who had barricaded himself inside his parents' home. A CIT-trained officer was present and was negotiating with the mentally ill person. Without consulting with the CIT officer, the commanding officer ordered officers who were not trained in CIT to enter the home. The situation rapidly escalated and the unarmed mentally ill individual was shot and killed. The Fifth Circuit found that the plaintiffs, the decedent's parents, had failed to establish deliberate indifference on the part of the city, because they "did not link this *potential* for constitutional violations to a pattern of actual violations." *Valle*, 613 F.3d at 548 (emphasis in original). Although the Valles presented evidence that the Houston Police received approximately forty calls per day involving situations in which CIT tactics would be appropriate, the Fifth Circuit found that they had failed "to meet the high hurdle of showing that excessive force was an obvious consequence of non-CIT officers responding to CIT situations." *Id.* at 550. *See also Norton v. City of S. Portland*, Case No. 2:10-cv-287-GZS, 2011 WL 6140918 at *20-23 (D. Me. Dec. 9, 2011) (plaintiff failed to establish City of South Portland's liability for mentally ill man's death during standoff with police officers because city had no notice of training deficiencies and there was no pattern of violations).

### C. Unconstitutional Policy or Custom

#### 1. FFPD Custom of Taser Misuse

What began in the Complaint as a claim that Chief Bubar failed to properly train and supervise Officer Reed in Taser use evolved in the Plaintiff's Response to Defendants' Motions for Summary Judgment into an argument that the FFPD had a custom of Taser misuse.[16] The Plaintiff has never claimed that the FFPD Taser policy itself is unconstitutional, and the record contains undisputed evidence that Officer Reed received Taser training.

Assuming for the purposes of the Defendants' Motions that Officer Reed's use of the Taser was an unconstitutional use of force,[17] the Plaintiff has shown no evidence of a widespread pattern of unconstitutional Taser use. There are no statistics showing the frequency of Taser use by the FFPD, there is no evidence of similar complaints, and the Plaintiff concedes that the FFPD Taser training was adequate. Without evidence of a pattern of similar violations by the FFPD, the Plaintiff has failed to establish an FFPD custom of Taser misuse. The FFPD cannot be held liable under § 1983 for a custom of Taser misuse.

---

[16]    The Plaintiff has not put forth any argument or submitted facts to support the additional allegations in the Complaint that the FFPD has municipal liability for failure to properly train and supervise in warrantless entry, arrest, discrimination based on sexual orientation, and freedom of speech. The Court will deem these claims waived. *See e.g. Berry v. City of S. Portland*, 525 F. Supp. 2d 214, 233 (D. Me 2007); *Dressler v. Cmty. Serv. Commc'ns, Inc.*, 275 F. Supp. 2d 17, 25-26 (D. Me. 2003).

[17]    The Fourth Amendment protects against excessive use of force by police during arrests. *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

### 2.  FFPD Failure to Implement Crisis Policy

What began in the Complaint as a claim that the FFPD failed to train its officers on how to deal with people with mental health disabilities narrowed after discovery to a claim that the FFPD should be liable for its failure to implement its Crisis Policy.[18]  Plaintiff's Response to Defendants' Motions for Summary Judgment at 18.

The stated purpose of the Crisis Policy is "to assist persons in mental health crisis in which law enforcement officers will make an arrest or protective custody determination to assist said person or protect the general public." DJSMF Additional Attachment 2 at 1 (Doc. 15-2). The Crisis Policy defines a mental health crisis as:

> Behavior that creates a condition, either physical or psychological in nature, which presents a threat of imminent and substantial harm to that person or to other persons. This behavior is characterized by symptoms such as: loss of contact with reality, extreme agitation, severe depression, imminent suicidal or homicidal tendencies, or the inability to control behavior to the extent that the symptoms are of sufficient severity that they cause such a degree of mental dysfunction that requires professional evaluation.

*Id.* at 2.

The Crisis Policy establishes a Crisis Intervention Team:

> [T]o provide this agency with qualified personnel trained in the handling of individuals in mental health crisis. The primary goal of the CIT is to ensure the proper disposition of individuals who come into contact with law enforcement officers while in crisis. This is accomplished through the use of skills involving identification of types of crisis and the de-escalation of individuals.

---

[18]     It is clear from the record that the FFPD does train its officers in how to deal with mentally ill individuals. *See supra* text accompanying note 13.

*Id.* at 4. The Crisis Policy states that "law enforcement officers will attempt to consult a CIT law enforcement officer prior to the use of physical control techniques on a person in mental health crisis." *Id.* at 5. The Plaintiff has shown that Officer Reed did not attempt to consult a CIT officer before using the Taser on Mr. Higgins. Even if he had, his attempt would have been futile, because, despite the Crisis Policy, the Plaintiff has established that the FFPD has not created a CIT or provided CIT training for any FFPD officers.

The Court assumes for the purpose of Defendants' Motions for Summary Judgment that Officer Reed violated the Plaintiff's constitutional rights. Even though the Plaintiff has not established that the situation confronted by Officer Reed was a usual and recurring situation faced by FFPD officers, the fact that the FFPD actually had a Crisis Policy that it failed to implement is minimally sufficient to create a triable issue for the jury on the question of whether the FFPD was deliberately indifferent to the rights of people suffering mental health crises.[19]

The Plaintiff's claim fails, however, because he cannot establish that having a Crisis Policy, including a CIT-trained officer and a CIT team, would have made a

---

[19]     The Court is cognizant of the FFPD's limited resources and personnel. The FFPD consists of only 4 full-time officers — Chief Bubar, a Sergeant, and two patrol officers — and 6-8 part-time officers who fill in when full-time officers are sick or on vacation or for special events. DJSMF at ¶ 41. The Supreme Court cautioned in *Canton*:

> In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident. . . . It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism.

*Canton*, 489 U.S. at 392.

difference in his case. In other words, he fails to establish that the failure to implement the Crisis Policy was the moving force behind the violation. This is because the Plaintiff has not presented a factual basis to establish that he was suffering a mental health crisis at the time of his arrest, and there is no evidence to suggest that Officer Reed should have understood the Plaintiff to have been a person suffering a mental health crisis.

According to the Plaintiff's own version of the events, he was behaving normally when he was assaulted by a police officer who charged into his apartment to effectuate an unlawful arrest for disorderly conduct. The Plaintiff denies that there was any incident which occurred outside the apartment. According to the Plaintiff, he did not provoke the arrest; he was not acting in a disorderly manner; he spoke calmly and did not swear or raise his voice; and he did not resist arrest. Based on the Plaintiff's version of the event, no reasonable law enforcement officer would have understood the Plaintiff to have been suffering a mental health crisis.

Even if the Court were to consider the Defendants' facts, on the theory that although they are denied by the Plaintiff, they are more favorable to him at least on this claim,[20] the Plaintiff would be unable to establish that he was in a mental health crisis. The facts asserted by Officer Reed describe a more pugnacious Mr. Higgins, but they do not establish that Mr. Higgins was undergoing a mental health

---

[20]     The Eleventh Circuit has rejected an argument that the Court accept a mixed description of the facts for summary judgment.  "[W]e accept the nonmovant's version of the events when reviewing a decision on summary judgment. When the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant. Instead when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005).

crisis as defined by the Crisis Policy. Mr. Higgins did not present a threat of imminent and substantial harm to himself or others. He did not appear to have lost contact with reality. He was neither severely depressed nor suffering from imminent suicidal or homicidal tendencies. Although he was feisty, his behavior did not suggest a degree of mental dysfunction which would have required professional evaluation.

Officer Reed understood (from Mrs. Higgins and from his own observations) that Mr. Higgins was intoxicated. While Officer Reed thought that Mr. Higgins's neighborhood displays were bizarre and even suggested to Mrs. Higgins that he seek mental health help, Officer Reed did not perceive Mr. Higgins to be someone suffering a mental health crisis.

While the Plaintiff has established that he suffers from some mental illness, he has not established that at the time of his arrest he was in a mental health crisis as defined by the Crisis Policy. Because, under either the Plaintiff's or the Defendants' factual scenario, the record does not permit a reasonable inference that the failure to implement the Crisis Policy caused any constitutional violations, the Court must grant summary judgment on Counts I and VI as against Defendant Bubar. Because municipal liability under the Maine Civil Rights Act is coterminous with municipal liability under section 1983, *Berube v. Conley,* 506 F. 3d 79, 84 (1st Cir. 2007), *Forbis v. City of Portland*, 270 F. Supp. 2d 57, 61 (D. Me. 2003), the Court must also enter summary judgment against the Plaintiff on Count II, the Maine Civil Rights Act claim, as against Defendant Bubar.

## II.     Americans with Disabilities Act

In Count III, the Plaintiff alleges that Officer Reed arrested Mr. Higgins, unlawfully entered Mr. Higgins's home, and Tased Mr. Higgins because of his mental illness, thereby providing unequal access to police and safety services in violation of § 12132 of Title II of the ADA.

### A. ADA Statute of Limitations

Defendants ask the Court to apply the two-year statute of limitations found in the MHRA, 5 M.R.S.A. § 4613(C), to Plaintiff's action, rendering it time-barred. The Court declines the Defendants' request to revisit Judge Carter's holding in *Conners v. Maine Med. Ctr.*, 42 F. Supp. 2d 34 (D. Me. 1999), that Maine's six-year statute of limitations for civil actions applies to actions under the ADA. [21]

The Defendants also argue that even if the six-year statute of limitations applies to actions brought under Title III of the ADA, a different statute of limitations should apply to actions brought under Title II. However, other courts

---

[21]     The Defendants argue that "the thoughtful exposition of the MHRA in the District of Maine in more recent years," specifically in *Rooney v. Sprague Energy Corp.*, 519 F. Supp. 2d 131 (D. Me. 2007), *Brown v. Hartt Transp.*, 725 F. Supp. 2d 210 (D. Me. 2010), and *Laksham v. Univ. of Maine Sys.*, 328 F. Supp. 2d 92 (D. Me 2004), warrants revisiting the appropriate statute of limitations for ADA claims. Yet, none of the cited cases cast any doubt on Judge Carter's decision in *Conners* to apply 14 M.R.S.A. § 752's statute of limitations to ADA claims, particularly as *Conners* explicitly recognized that the MHRA is most analogous to the ADA yet nonetheless held that 14 M.R.S.A. § 752 should apply.

 *Conners* relied on the Supreme Court's analysis in *Wilson v. Garcia*, 471 U.S. 261, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985), which encouraged characterizing civil rights claims generally and applying a single statute of limitations to all § 1983 claims rather than looking to the particular facts of each claim. *Conners*, 42 F. Supp. 2d at 51. When a federal statute does not contain a statute of limitations, *Wilson* directs courts "to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson*, 471 U.S. at 266-67. In *Wilson*, the Court held that claims under § 1983 for violations of constitutional rights are best characterized as personal injury claims. *Wilson*, 471 U.S. at 277-80. A decision to apply the MHRA statute of limitations to an ADA claim would create inconsistency in the applicable statutes of limitations for ADA and Rehabilitation Act claims and defeat *Wilson*'s consistency mandate.

have not differentiated between Titles II and III of the ADA. *See Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 n.3 (7th Cir. 1996) (collecting cases). The Court sees no reason to apply a different statute of limitations here.

For all of these reasons, the Court finds that Plaintiff's claim under the ADA is timely.

## B. Proper Defendants

Defendant Reed seeks summary judgment on Count III because Title II of the ADA applies to governmental entities only; it does not apply to individual employees. *Norton v. City of S. Portland*, No. 2:10-cv-287-ZS, 2011 WL 6140918, at *17 (D. Me. 2011) (citing *Ms. K v. City of S. Portland*, 407 F. Supp. 2d 290, 296 n.3 (D. Me. 2003) (collecting cases)). The Court agrees.

## C. The Merits of the Title II ADA Claim

Title II of the ADA addresses discrimination by public entities in their services, programs, and activities. Section 12132 specifically provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132 (2005).

### 1. Qualified Individual with a Disability

A qualified individual is defined by the ADA as:

[A]n individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility

requirements for the receipt of services or the participation in programs or activities provided by a public entity.

§ 12131(2). The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of having such an impairment; or (C) being regarded as having such an impairment." § 12102(2).

The Defendants argue that the record evidence does not establish that the Plaintiff has a mental impairment that substantially limits a major life activity or that the Plaintiff was regarded by Officer Reed as having such an impairment. The Plaintiff responds that the record contains evidence that he has a mental health disability, that Officer Reed and Chief Bubar perceived him to have a mental health disability, and that his mental illness substantially limits his ability to work.[22]

The Court sidesteps this issue because it finds that the Plaintiff cannot prevail on his Title II claim even if he is a qualified individual with a disability.

## 2. Denial of Benefits Because of Disability

A plaintiff bringing a claim under Title II of the ADA must prove "that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against" and "that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Buchanan* 469 F.3d at 170-71 (quoting *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000)). Federal courts recognize two theories

---

[22]     The Court notes that the Plaintiff has produced only the barest of factual support for Mr. Higgins's disability. There is some dated evidence in the record that Mr. Higgins suffered from mental illness, but there is also evidence in the record that Mr. Higgins's symptoms were controlled by medication.

of discrimination under Title II of the ADA arising from arrests: wrongful arrest and failure to reasonably accommodate during arrest. In *Gohier*, the Tenth Circuit explained the two:

> The first is that police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity. The second is that, while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process that other arrestees.

*Gohier v. Enright*, 186 F.3d 1216, 1220-21 (10th Cir. 1999) (internal citations omitted).[23] In *Gohier*, the plaintiff represented the estate of Mr. Lucero, a paranoid schizophrenic, who was fatally shot by a police officer when he advanced on the officer holding what looked like a knife. The Tenth Circuit characterized the nature of the plaintiff's ADA claim as:

> Logically intermediate between the two archetypes . . . Officer Enright did not use force on Mr. Lucero because he misconceived the lawful effects of his disability as criminal activity, inasmuch as Lucero's assaultive conduct was not lawful. Neither did Enright fail to accommodate Lucero's disability while arresting him for some crime unrelated to his disability. Instead, Enright used force on Lucero while Lucero was committing an assault related to his disability.

---

[23]    *See Jackson v. Town of Sanford*, No. 94-12-P-H, 1994 WL 589617, at *1 (D. Me. Sept. 23, 1994) (summary judgment against plaintiff on Title II ADA claim denied where police arrested plaintiff because they mistook slurred speech and swaying caused by stroke as drug or alcohol impairment); *Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998) (paraplegic arrestee who was not provided with accommodations in post-arrest transportation stated claim for discrimination under Title II of ADA); *Lewis v. Truitt*, 960 F. Supp. 175, 178 (S.D. Ind. 1997) (summary judgment against plaintiff on Title II ADA claim denied where police officers knew that plaintiff was deaf yet arrested him for not responding appropriately). *Cf. Bates ex rel. Johns v. Chesterfield Cnty.*, 216 F.3d 367, 373 (4th Cir. 2000) (Bates not arrested because of his disability but because there was probable cause to believe that he assaulted a police officer, thus, the stop, the use of force, and the arrest of Bates were not by reason of Bates's disability, but because of Bates's objectively verifiable misconduct); *Scozzari v. City of Clare*, 723 F. Supp. 2d 974, 980 (E.D. Mich. 2010) (officer's perception of Scozzari's conduct as criminal assault was based on nature of the underlying conduct, not because his disability made conduct appear unlawful).

*Gohier*, 186 F.3d at 1221 (internal citations and quotation omitted).

The Plaintiff fails to articulate his theory for recovery under Title II of the ADA other than to state that "he was deprived of equal access to police services because of a mental health disability." Plaintiff's Response to Defendants' Motions for Summary Judgment at 11. Plaintiff lays down the following dots but fails to connect them: 1) Officer Reed's arrest of the Plaintiff for disorderly conduct was illegal; 2) the basis of Officer Reed's actions were Plaintiff's verbal protests of Officer Reed's actions; 3) Plaintiff's verbal protests are protected speech under the First Amendment; 4) Plaintiff's verbal protests were a manifestation of his paranoid delusions; and 5) Plaintiff's verbal protests so angered Officer Reed that he later filed a false indecent exposure probable cause affidavit.

As legal support for his theory, Plaintiff relies on *Barber v. Guay*, 910 F. Supp. 790 (D. Me. 1995). Although Barber brought a Title II ADA claim asserting that he had been denied proper police protection and fair treatment due to psychological and alcohol problems, and although the claim survived a motion for summary judgment, it is clear that the defendant in *Barber* had a limited argument for summary judgment different from what is being asserted here. The Tenth Circuit explained the limitations of *Barber* as follows:

> In the brief part of the opinion declining to dismiss Barber's ADA claim, the court did not specify how the police may have violated Title II in his arrest. The ADA discussion is cursory, as it serves only to reject a misguided argument that, because Barber was not an employee under ADA's Title I, the ADA did not apply at all. *Barber*

thus offers little help in deciding when Title II claims are viable in an arrest context.

*Gohier*, 186 F.3d at 1221 n.3 (internal citations omitted).

Whether the Plaintiff is proceeding under a wrongful arrest theory, a failure-to-accommodate-during-arrest theory, or some hybrid of the two, an essential element of any theory would be that the discrimination be "by reason of the Plaintiff's disability." *Buchanan*, 469 F.3d at 171. Under the Plaintiff's version of the events, the Plaintiff made a single comment to Officer Reed about the previous night's involvement with Officer Chartier. This exchange took 15 to 20 seconds and the Plaintiff spoke in a normal tone of voice. He made no verbal outbursts. He did not swear. He did not resist arrest. He did not defy Officer Reed. Plaintiff fails to explain how Officer Reed could have been motivated by verbal outbursts which were manifestations of Plaintiff's paranoid delusions when the Plaintiff claims that he made no verbal outbursts. The Plaintiff has not established a factual predicate sufficient to allow a reasonable factfinder to infer that he engaged in any behavior that could have been perceived as stemming from his disability. Because he has failed to establish that any discrimination by Officer Reed was because of Plaintiff's disability, the Title II claim under the ADA fails.

The Plaintiff's argument that Officer Reed baselessly charged Mr. Higgins with indecent exposure also does not provide a basis for an ADA claim. The inference that the Plaintiff asks the Court to draw, that Officer Reed completed the probable cause affidavit for indecent exposure out of anger at the (non-existent) verbal outbursts caused by Mr. Higgins's mental illness, and not because Mr.

Higgins exposed his backside and pubic hair to neighborhood children, causing affront and alarm, is not supported by record evidence and is not reasonable. Although Officer Reed may have been wrong to complete the probable cause affidavit when he did not have adequate evidence that Mr. Higgins showed his genitals, there is no evidence that he did so because of animus towards Mr. Higgins on account of his mental illness.

To the extent that the Plaintiff is making an argument that the FFPD violated Title II of the ADA for failing to sufficiently train its officers, this argument is foreclosed by the First Circuit's decision in *Buchanan*. The First Circuit did not decide whether Title II imposes a duty on police departments to have policies and training on the needs of the mentally ill, but did find that if a police department does have policies and training, "[a]n argument that police training, which was provided, was insufficient does not present a viable claim that Buchanan was 'denied the benefits of the services . . . of a public entity' by reason of his mental illness, as required under 42 U.S.C. § 12132." *Buchanan*, 469 F.3d at 177. As discussed above, the FFPD did generally train its officers in dealing with the needs of the mentally ill. The absence of a CIT team or CIT trained officer is not fatal here, because the Plaintiff has not established evidence that the situation called for a CIT response.

### III.   Count IV: Maine Human Rights Act Disability Discrimination

The parties agree that Count IV of the Complaint, alleging violations of the MHRA, Title 5 M.R.S.A. § 4591,[24] is time-barred by the MHRA's two-year statute of limitations.[25] The incident between Officer Reed and Mr. Higgins that is the basis for this suit is alleged to have occurred "on or about May 27, 2007," well over two years from April 13, 2011, when Plaintiff commenced this action.

### IV.   Count V: Maine Human Rights Act Sexual Orientation Discrimination

In his Complaint, the Plaintiff bases his claim under the MHRA, 5 M.R.S.A. § 4552 *et seq.* Section 4613(2)(C) of the MHRA provides a two-year statute of limitations for actions under the MHRA's civil action provision, 5 M.R.S.A. § 4621. The Plaintiff argues in his Response that his action could be brought under 5 M.R.S.A. § 4682, the civil action provision of the MCRA. However, it was not brought under this provision. Therefore, the Plaintiff's claim of discrimination in access to police and safety services on May 27, 2007, is untimely.

### V.   Punitive Damages

Punitive damages are not available against a municipality. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Both parties agree that punitive damages are not available against Chief Bubar.

---

[24]     *See also* 5 M.R.S.A. 4592(1) ("unlawful discrimination also includes . . . **E.** A qualified individual with a disability, by reason of that disability, being excluded from participation in or being denied the benefits of the services, programs or activities of a public entity, or being subjected to discrimination by any such entity.").

[25] "The action must be commenced not more than either 2 years after the act of unlawful discrimination complained of . . . ." 5 M.R.S.A. § 4613(2)(C).

## CONCLUSION

Defendant Bubar's Motion for Summary Judgment is hereby **GRANTED**.
Defendant Reed's Partial Motion for Summary Judgment on Counts III, IV, and V is
hereby **GRANTED**.


SO ORDERED.

Dated this 2nd day of August, 2012.

/s/ Nancy Torresen
United States District Judge